THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,     :
                                     :
      v.                     :   3:20-CR-00047
                                     :   (JUDGE MARIANI)
ALMALIK WASHINGTON,         :
                                     :
          Defendant.      :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Defendant Almalik Washington's "Motion to Suppress

Stop and Search of Vehicle" (Doc. 52). Defendant is charged with Unlawful Possession of a

Firearm in violation of 18 U.S.C. § 922(g), Possession of a Firearm with Altered Serial

Numbers in violation of 18 U.S.C. § 922(k), and Possession of a Controlled Substance in

violation of 21 U.S.C. § 844(a). (Doc. 1). The present Motion seeks to suppress all

evidence recovered as a result of a roadside car search, including the firearm and the

alleged marijuana. For the reasons that follow, the Court will deny Defendant's Motion.

### II. BACKGROUND

On the evening of December 3, 2019, Pennsylvania State Trooper Joseph P. Urban

was sitting perpendicular to Interstate 80 on a cross-over at mile marker 286 monitoring

westbound traffic. (Feb. 12, 2021 Hr'g Tr., Doc. 67 at 6:14-17). At the time, Trooper Urban

was assigned to the Pennsylvania State Police Safe Highways Initiative through Effective

Law Enforcement and Detection, or SHIELD Unit. (*Id*. at 4:16-20). Through that role in the

SHIELD Unit, Trooper Urban obtained training in criminal interdiction on the highway, which "covered pre-stop indicators, looking for different driving behaviors, human behavior, thorough searches of vehicles, hidden compartments . . . every aspect of criminal interdiction." (*Id*. at 4:23-25; 5:10-14).

While monitoring traffic on the evening of December 3, 2019, Trooper Urban observed a vehicle pass him driving in the left lane. (*Id*. at 6:18-21). After the vehicle was about two to three-tenths of a mile past him down the road, the driver hit the brakes for a prolonged period of time. (*Id*). Trooper Urban also observed that the vehicle was driving in the left lane with no other vehicles around, and the vehicle was not actively passing another vehicle, exiting on the left, or allowing cars to merge. (*Id*. at 7:12-18).

After seeing that driving behavior, Trooper Urban left his stationary position and entered the flow of traffic. (*Id*. at 7:7-9). Trooper Urban eventually caught up to the vehicle and conducted a traffic stop for a violation of Pennsylvania Vehicle Code § 3313(d)(1), traveling in the left lane when the right lane was readily available. (*Id*. at 7:8-18).

After both vehicles stopped, Trooper Urban approached Defendant's vehicle on the passenger side, introduced himself, explained that the stop was being recorded, and asked Defendant for his driver's license, registration, and insurance information. (*Id*. at 8:23-25, 9:1-4). Upon asking for that information, Trooper Urban observed that Defendant had his license already in his hand. (*Id*. at 9:4-5). He also noted that Defendant was "slightly tilted

against his driver's door, his eyebrows were raised, his eyes were very wide and his mouth

was open" during the interaction.  (*Id.* at 9:5-8).

During this initial conversation, Trooper Urban explained to Defendant why he pulled

him over:

> **Trooper Urban**: In Pennsylvania on the interstate, you can drive in the left lane
> if you're actively passing, exiting on the left, or letting cars merge on, okay?
> When you passed me back there, the right lane was wide open, you're just
> cruising in the left lane.  On top of it, man, you hit your brakes so hard, if
> someone was behind you . . .
>
> **Defendant**: Yeah.
>
> **TU**: . . . Dude they might have drove right through you.
>
> **D**: Yeah.  I didn't, I didn't know . . . [inaudible].
>
> **TU**: It's all good man, as long as your license is good and everything makes
> sense I'll probably give you a warning.

(Gov't. Ex. 4, MVR Video – Full, at 00:02:05-00:02:27).

Trooper Urban then asked Defendant where he was headed.  (Hr'g Tr., at 10:9).

Trooper Urban is heard on the audio portion of the Mobile Video Recorder ("MVR") further

questioning Defendant as follows:

> **TU**: Where you off to today?
>
> **D**: I'm going to my hotel room.
>
> **TU**: Oh yeah?  Where abouts?
>
> **D**: In...ah...in Wilkes-Barre.
>
> **TU**: Oh, okay.

**D**: Yeah.

**TU**: What hotel are you staying at?

**D**: I'm at the Days Inn.

**TU**: Days Inn?

**D**: Yeah.

**TU**: For what reason are you going there?

**D**: For work.

**TU**: Oh, what do you do?

**D**: Environmental work.

**TU**: Oh really?

**D**: Yeah.

**TU**: Who do you work for?

**D**: ROI.  It's in Jersey though.

**TU**: What's the name?

**D**: ROI.  Staffing.

**TU**: Oh, okay.  What kind of work do you do?

**D**: Environmental work.  Cleaning like oil spills, and tank cleaning, and stuff like that.

**TU**: Are you working anywhere in particular in Wilkes-Barre, or?

**D**: Nah, we're actually working in … uh … [snaps fingers] … Scranton.

Scranton.

**TU**: Okay.

**D**: Yeah.

**TU**: Alright, good deal.

**D**: But the hotel is in Wilkes-Barre though.

**TU**: License good, everything good?

**D**: Yeah, everything is good.  Everything is good.  No problems.

**TU**: Sounds good.  Sit tight.  I'll be right with you.

(Gov't. Ex. 4, MVR Video – Full, at 00:02:29-00:03:25).

During his testimony, Trooper Urban noted that Defendant provided "a very vague answer" when asked where he was heading, never made eye contact, paused before answering, and was looking up in the air while answering questions.  (Hr'g Tr., at 10:8-12).  Trooper Urban also learned that Defendant was staying at the Days Inn hotel in Wilkes-Barre but working in Scranton.  (*Id*. at 10:13-15).  Through his knowledge of the area, Trooper Urban believed that the Days Inn was located on Kidder Street.  (*Id*. at 11:17-20).  Based on his "[l]aw enforcement experience, as well as just being an informed citizen reading the news," Trooper Urban said he was familiar with that hotel and several others in the area being "known for sales of narcotics and prostitution."  (*Id*. at 11:23-25, 12:1).

As Trooper Urban was walking back to his vehicle to check Defendant's license, he is heard on the MVR stating that he believed Defendant was "clearly lying."  (MVR, at

00:03:30). Once back in his patrol car, Trooper Urban is heard on the MVR questioning

Defendant's answers, stating to himself: "environmental work . . . Days Inn . . . he doesn't

know where he's working." (MVR, at 00:03:37-00:03:46).

Trooper Urban testified that he then checked Defendant's license and registration, at

which point he learned that Defendant was from Elizabeth, New Jersey. (Hr'g Tr., at 15:2-

7). At about six minutes into the stop, Trooper Urban is heard on the MVR remarking that

Defendant has a "two-page criminal history," noting "multiple felony convictions for

possession with intent to deliver heroin." (MVR, at 00:05:58-00:06:09). Trooper Urban

testified that after learning of Defendant's criminal history, "[b]ased off of all the indicators I

observed from his driving behavior, all the way through the criminal history, I decided to

contact another trooper for backup, as I was going to ask him for consent to search his

vehicle." (Hr'g Tr., at 17:14-17). Thereafter, Trooper Urban contacted State Trooper

Richard Weinstock for backup. (Id. at 17:15-19).

When Trooper Weinstock arrived, Trooper Urban approached Defendant's vehicle

again and asked him to exit to the rear, where he performed a pat down search of

Defendant. (Hr'g Tr., at 18:1-2; MVR, at 00:12:22). Trooper Urban also asked Defendant

further questions about his hotel location, where he was coming from, and where he was

going. (MVR, at 00:12:32). Trooper Urban informed Defendant that he was going to give

him a warning about the left lane traffic violation. (Id. at 00:12:50). Trooper Urban then

asked Defendant for consent to search his vehicle, and Defendant refused. (Id. at

00:13:08).  At that time, Trooper Urban informed Defendant that he would be contacting a

Canine Unit.  (*Id.* at 00:14:10).  While waiting for the Canine Unit to arrive, Trooper Urban,

Trooper Weinstock and Defendant sat in Trooper Urban's vehicle.  (*Id.* at 00:18:31).

The Canine Unit, which consisted of Corporal Anthony Doblovasky and Drug

Detection Canine Micho, arrived approximately forty-five minutes into the traffic stop.  (*Id.* at

00:44:58).  Upon arrival, Corporal Doblovasky and Trooper Urban discussed the basis for

Trooper Urban's reasonable suspicion to search Defendant's vehicle.  Based on this

conversation, Corporal Doblovoksy determined that Canine Micho would be deployed.  (Hr'g

Tr., at 86:18-24, 87:1-11).

Corporal Doblovasky and Canine Micho performed an exterior search beginning at

the front of the vehicle.  (*Id.* at 88:2-6).  On the first pass, Corporal Doblovasky observed

Canine Micho's alert behavior at the driver side door of the vehicle.  (*Id.* at 88:17-19; 89:22-

24).  As they continued the search, Canine Micho exhibited alert behavior again at the front

passenger side door by jumping up on the window.  (*Id.* at 88: 22-24).  Canine Micho then

stopped, pointed, and stared at the front driver's side window, which Corporal Doblovasky

identified as Canine Micho's indication of the presence of drugs.  (*Id.* at 88:23-25, 89:1-3,

91:23-25).

After the exterior search, Corporal Doblovasky informed Defendant that Canine

Micho alerted his vehicle and that they would conduct a search of his vehicle.  (MVR, at

00:50:35).  During the interior search of Defendant's vehicle, Corporal Doblovasky and

Trooper Urban seized a High Point .22 caliber revolver loaded with nine rounds of ammunition from a pair of pants inside a backpack on the floor of the rear passenger seat. (Gov.'s Ex. 2, Trooper Urban Report, at 1).  Corporal Doblovasky and Trooper Urban also identified a "green vegetable matter" on top of the dash and in the center console area of the vehicle.  (Hr'g Tr., at 21:7-8).  Trooper Urban and Corporal Doblovasky identified this substance as marijuana shake.  (*Id.* at 21:8-9, 109:19-20).

On February 25, 2020, a Grand Jury returned an indictment charging Defendant with Unlawful Possession of a Firearm in violation of 18 U.S.C. § 922(g), Possession of a Firearm with Altered Serial Numbers in violation of 18 U.S.C. § 922(k), and Possession of a Controlled Substance in violation of 21 U.S.C. § 844(a).  (Doc. 1).  On September 28, 2020, Defendant filed the present Motion, which seeks to suppress "[a]ll fruits from the unlawful search and seizures."  (Doc. 52 at 4).  A suppression hearing was held on February 12, 2021.  Thereafter, the parties filed post-hearing briefs and the motion is now ripe for decision.

## III. ANALYSIS

Defendant's present Motion seeks to suppress "[a]ll evidence recovered as a result of the search of the car . . . including the firearm and the alleged marijuana."[1]  (Brief in Support of Motion to Suppress Stop and Search of Vehicle, Doc. 53 at 24).  Defendant

---

[1] Defendant's Brief in Support of his Motion to Suppress Stop and Search of Vehicle seeks to suppress "the alleged marijuana" (Doc. 53 at 24), whereas his Post-Hearing Supplemental Brief seeks to suppress "the photos of the vegetable matter." (Doc. 73 at 25).

raises a variety of arguments as to why the initial traffic stop and the subsequent detention and search by the police violated his Fourth Amendment rights.  The Court will address each argument in turn.

## A. Initial Traffic Stop

Defendant first challenges Trooper Urban's basis for the initial traffic stop, arguing that the "facts do not support a reasonable suspicion that Mr. Washington was violating Pennsylvania traffic law." (Doc. 53 at 7).  Rather, Defendant claims that the traffic conditions prior to and during the stop support a finding that "he was moving at a rate faster than the flow of traffic," giving him a "lawful reason for his vehicle remaining in the left lane." (*Id*. at 9–10).

The Government argues that Trooper Urban identified specific, articulable facts to support a reasonable suspicion that Defendant violated Pennsylvania's left lane traffic law. (Supplemental Brief in Opposition to Defendant's Motion to Suppress Evidence, Doc. 74 at 2).  The Government further argues that "even if the facts relied upon by Trooper Urban were not completely correct, or were insufficient as a legal matter to make out the traffic violation, it was nevertheless reasonable for him to have believed a violation occurred." (Brief in Opposition to Defendant's Motion to Suppress Evidence, Doc. 58 at 10).

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures."  U.S. Const. amend. IV.  "The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under

the Fourth Amendment." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

"[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Johnson*, 63 F.3d at 245.  Here, because the seizure of Defendant occurred without a warrant, the Government bears the burden of showing that the seizure was reasonable.  *See United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); *Johnson*, 63 F.3d at 245) ("The Government bears the burden of showing (and presenting evidence) that the traffic stop was unreasonable").

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).  "A well-established exception to the Fourth Amendment's warrant requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).  Accordingly, "[a] routine traffic stop is constitutional when it is supported by reasonable suspicion." *United States v. Gooch*, 915 F. Supp. 2d 690, 702

(W.D. Pa. 2012); *see also United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (holding that the "reasonable suspicion standard applies to routine traffic stops"). "Where reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237.

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). "In forming a reasonable suspicion, officers may rely on their own experience and knowledge." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). "When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a court] must consider the totality of the circumstances." *Lewis*, 672 F.3d at 237. Further, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact 'does not violate the Fourth Amendment.'" *Delfin-Colina*, 464 F.3d at 398 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)); *see also United States v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (noting that the standard for a traffic stop "is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts").

In the case at hand, Trooper Urban testified that he pulled Defendant over for a

violation of 75 Pa. C.S. § 3313(d)(1).  (Hr'g Tr., at 7:12-18).  That statute provides, in

pertinent part:

> (1) Except as provided in paragraph (2) and unless otherwise posted, upon all limited access highways having two or more lanes for traffic moving in the same direction, all vehicles shall be driven in the right-hand lanes when available for traffic except when any of the following conditions exist:
>
> > (i) When overtaking and passing another vehicle proceeding in the same direction.
> >
> > (ii) When traveling at a speed greater than the traffic flow.
> >
> > (iii) When moving left to allow traffic to merge.
> >
> > (iv) When preparing for a left turn at an intersection, exit or into a private road or driveway when such left turn is legally permitted.

75 Pa. C.S. § 3313(d)(1).

As to the basis for the traffic stop and the particular traffic law violated, Trooper

Urban testified:

> Yes, as [Defendant] was driving in the left lane, there were no other vehicles around him.  Pennsylvania Vehicle Code 33.13(d)1 [sic] states that you can drive in the left lane if you're actively passing, exiting on the left or allowing cars to merge on.
>
> None of those exceptions were taking place, so it was a violation of the that vehicle code section that the traffic stop was conducted for.

(Hr'g Tr., at 7:10-18).

Trooper Urban also detailed the factual basis for stopping Defendant in the "General

Offense Report" he prepared in connection with the December 3, 2019 traffic stop, which

states: "I observed a sedan traveling in the left lane when the right lane was readily

available for travel in violation of PA VC 3313(d) (1). The sedan was not passing another

vehicle, no vehicles were merging onto the Interstate nor were there any exits on the left."

(Gov't. Ex. 2, Trooper Urban Report, at 1).

To support his claim that Trooper Urban lacked the requisite reasonable suspicion

that Defendant committed a traffic violation, Defendant points to the highway conditions

captured on the MVR footage from December 3. (Defendant's Post-Hearing Supplemental

Brief In Support of Motion to Suppress Stop and Search of Vehicle, Doc. 73 at 6). However,

it is important to note that the MVR did not start recording the traffic stop until approximately

30 seconds before Trooper Urban activated his lights.[2] (Hr'g Tr., at 8:14-16). Thus, while

the MVR captures some of the traffic conditions described by Defendant in his briefs[3], it

does not capture the highway conditions at the precise moment Trooper Urban observed

the alleged traffic violation.

Noting the delay in the video recording, Defendant claims that the MVR still

_____

[2] When explaining how the Mobile Video Recorder ("MVR") mounted in his car functions, Trooper
Urban testified:

> There's an MVR in the car, Mobile Video Recorder, there's a video section that's mounted
> to the dash and an audio microphone that I would wear on my person. Upon me activating
> the emergency lights in the vehicle, that video portion would begin recording 30 seconds
> prior to.

(Hr'g Tr., at 8:2-6).

[3] Defendant states that the following traffic conditions were present on December 3, 2019: "No
vehicles were behind Mr. Washington's vehicle in the left lane. There were other vehicles on the highway
that night traveling in the right lane. There was a traffic flow as Mr. Washington's vehicle passed trooper
Urban." (Doc. 53 at 7).

"suggests that Mr. Washington drove faster than the flow of traffic," which is listed as an

exception to § 3313(d)(1).  (Doc. 73 at 6–7).  When the video begins, Defendant's vehicle is

seen driving in the right-hand lane, while Trooper Urban is driving behind him in the left-

hand lane.  (MVR, at 00:00:00).  Approximately two to three vehicles can be seen driving in

front of Defendant's vehicle in the right-hand lane.  (*Id*).  At 41 seconds into the video,

Defendant is seen hitting his brakes and starting to pull over onto the right shoulder of the

highway.  (*Id*. at 00:00:41).  At one minute into the video, Defendant and Trooper Urban

have both stopped on the shoulder.  (*Id*. at 00:01:00).  From the start of the video up until

Trooper Urban is out of his vehicle and speaking with Defendant, 19 cars are observed

passing by in both the right and left-hand westbound lanes.  (*Id*. at 00:00:56-00:01:55).

Cars continue to pass by periodically throughout the duration of the traffic stop.

Thus, while the video shows that "[t]here were other vehicles on the highway that

night traveling in the right lane" it does not show that "[n]o vehicles were behind Mr.

Washington's vehicle in the left lane" or that "[t]here was a traffic flow as Mr. Washington's

vehicle passed trooper Urban."  (Doc. 53 at 7).  Nor does the video support a finding that

"Mr. Washington must have closed in on the vehicle in front of him as trooper Urban was

following him.  Thus, moving faster than the flow of traffic."  (Doc. 73 at 7–8).

The conversation between Trooper Urban and Defendant captured by the MVR

further supports a finding that Trooper Urban had reasonable suspicion to believe

Defendant violated 75 Pa. C.S. § 3313(d)(1).  As previously set out, the following exchange

is heard at approximately at approximately two minutes and thirty seconds into the audio

portion of the MVR:

> **Trooper Urban**: In Pennsylvania on the interstate, you can drive in the left lane
> if you're actively passing, exiting on the left, or letting cars merge on, okay?
> When you passed me back there, the right lane was wide open, you're just
> cruising in the left lane.  On top of it, man, you hit your brakes so hard, if
> someone was behind you . . .
>
> **Defendant**: Yeah.
>
> **TU**: . . . Dude they might have drove right through you.
>
> **D**: Yeah.  I didn't, I didn't know . . . [inaudible].

(MRV, at 00:02:05-00:02:23).

Consistent with his testimony and General Offense Report, Trooper Urban

immediately explained to Defendant that he observed him driving in the left lane when the

right lane was available.  (*Id*).  This exchange between Trooper Urban and Defendant also

suggests that Defendant acknowledged that he was driving in the left lane without

performing any of the exceptions listed by Trooper Urban before he was pulled over.  During

the conversation, Defendant does not offer any explanation as to why he was driving in the

left lane, but rather accepts Trooper Urban's version of what happened.

Defendant further argues that Trooper Urban made a mistake of law when he

"omitted a clearly written exception" to 75 Pa. C.S. § 3313(d)(1) for when a vehicle is

"traveling at a speed greater than the traffic flow."  (Doc. 73 at 8).

During his initial conversation with Defendant, Trooper Urban lists the exceptions to

Pennsylvania's right-hand lane rule as when a vehicle is "actively passing, exiting on the left, or letting cars merge on." (MVR, at 00:02:05). At the February 12, 2021 hearing, Trooper Urban also listed the exceptions as when a vehicle is "actively passing, exiting on the left or allowing cars to merge on." (Hr'g Tr., at 7:13-15). As Defendant points out, this list excludes the distinct exception listed at 75 Pa. C.S. § 3313(d)(1)(ii) for when a vehicle is "traveling at a speed greater than the traffic flow." However, the Third Circuit has held:

> [A] mistake of law is only unreasonable when the officer does not offer facts that objectively show that the identified law was actually broken. In situations where an objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact violated the traffic-code provision cited by the officer, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed by the cited traffic-code provision. Therefore an officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

*Delfin-Colina*, 464 F.3d at 399–400.

Thus, "the proper inquiry is not whether a traffic violation actually occurred, but rather whether there are facts presented that would lead a reasonable officer to believe that a violation may have occurred." *Fleetwood*, 235 F. App'x at 896. "This standard is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts." *Id.* at 895.

Based on the foregoing, even if Trooper Urban made a mistake of law by omitting

the exception for vehicles "traveling at a speed greater than the traffic flow," the Court finds

that Trooper Urban nonetheless articulated specific facts that objectively demonstrate his

reasonable suspicion that Defendant violated 75 Pa. C.S. § 3313(d)(1).  Trooper Urban

testified that he observed Defendant "driving in the left lane, there were no other vehicles

around him."  (Hr'g Tr., at 7:12-13).  This observation is similarly documented in the General

Offense Report prepared by Trooper Urban, as well as captured in the recorded

conversation between Trooper Urban and Defendant.  (*See* Gov. Ex. 2, Trooper Urban

Report; Gov. Ex. 4, MVR Video – Full).  The evidence presented thus supports a finding that

Trooper Urban possessed a reasonable suspicion that Defendant violated § 3313(d)(1).

Therefore, as the initial traffic stop was based on Trooper Urban's reasonable

suspicion that Defendant violated Pennsylvania traffic law, it did not violate Defendant's

Fourth Amendment rights.  Accordingly, the Court will deny Defendant's Motion to Suppress

insofar as it is based on Defendant's claim that Trooper Urban lacked reasonable suspicion

for the initial traffic stop.

### B. Length of Traffic Stop

### 1. Reasonable Suspicion to Extend Traffic Stop

Next, Defendant argues that the traffic stop was unlawfully extended without

adequate reasonable suspicion.  (*See* Doc. 53 at 10–18; Doc. 73 at 9–20).

As discussed above, the Fourth Amendment protects the public from "unreasonable

searches and seizures" by the government.  U.S. Const. amend. IV.  "[A] seizure lawful at

its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed.2d 85 (1984).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.

"In describing what inquiries qualify as 'unrelated,' *Rodriguez* drew a distinction between 'ordinary inquiries incident to' a traffic stop, which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355) (internal citation omitted). Typically, ordinary inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The Third Circuit has further held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410).

When it comes to inquiries unrelated to the traffic stop, "there is no *de minimus* exception

to" the *Rodriguez* rule. *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575 U.S. at 357).

Thus, "[a]n officer . . . may conduct certain unrelated checks during an otherwise

lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the

reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez* at

355.  In other words, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission

are completed or reasonably should have been completed, an officer must have an

objectively reasonable and articulable suspicion that illegal activity had occurred or was

occurring." *Garner*, 961 F.3d at 271 (citing *Rodriguez*, 575 U.S. at 355; *Clark*, 902 F.3d at

410).  If the officer possessed reasonable suspicion of criminal activity prior to extending the

traffic stop, no violation of the Fourth Amendment has occurred.  *See id.*

When determining whether a traffic stop was unconstitutionally prolonged, a court

must first determine the "*Rodriguez* moment," meaning the moment that the traffic stop was

measurably extended for purposes of a Fourth Amendment analysis.  *Green*, 897 F.3d at

179, 181.  Once the *Rodriguez* moment is established, the Court must then assess

reasonable suspicion based on the facts available to the officer at that time.  *Id.* at 181 ("The

key question is . . . whether the "*Rodriguez* moment" instead occurred when [the officer]

returned to his vehicle after his brief initial conversation with Green and made an unrelated

phone call to his colleague.  If it did, then nothing later in the stop can inform our reasonable

suspicion analysis."); *see Contreras v. Conrad*, No. 3:17-CV-02360, 2020 WL 2193429, at

*6 (M.D. Pa. May 6, 2020) (citing *Green*, 897 F.3d at 179) ("Determining when the

*Rodriguez* moment occurred, however, is crucial to the analysis under *Rodriguez* and its

progeny, because any information that the police discover after the *Rodriguez* moment

cannot inform a court's analysis of whether the police had a reasonable suspicion that a

crime was being committed.").

Here, in his post-hearing supplemental brief, Defendant argues that the *Rodriguez*

moment occurred "when trooper Urban contact[ed] trooper Weinstock to come to the scene

to assist with a consent search," reasoning that such a search "is outside the tasks tied to

the purposes of a traffic stop."[4]  (Doc. 73 at 9).  The Government does not point to a precise

moment at which Trooper Urban developed reasonable suspicion to extend the traffic stop,

but rather argues that "the brief detention was independently supported by reasonable and

articulable suspicion of criminal activity developed both prior to and during the traffic stop."

(Doc. 58 at 12).

There is no doubt that the traffic stop was measurably extended the moment Trooper

Urban called Troper Weinstock for backup to perform a consent search.  Calling a colleague

_____

[4] In his initial Brief in Support of the Motion to Suppress, Defendant proposes two other possible
*Rodriguez* moments.  He first suggests that "the earliest *Rodriguez* moment" occurred immediately after
Trooper Urban's initial conversation with Defendant when Trooper Urban states that Defendant is "clearly
lying." (Doc. 53 at 12).  Next, Defendant suggests that "the latest *Rodriguez* moment" occurred when
Trooper Urban issued Defendant a warning for the left lane violation, which occurred after Trooper Urban
performed a pat-down search of Defendant outside the vehicle.  (Doc. 53 at 12–13).  Because Defendant
does not indicate his continued reliance on an earlier *Rodriguez* moment in his most recent submission to
the Court (Doc. 73), the Court will assume he only argues the later *Rodriguez* moment, which is analyzed
within the text.  However, *see* the Court's analysis *infra*, pp.28–29, n.7, addressing the assertions in
Defendant's pre-hearing brief wherein he proposes other potential "*Rodriguez*" moments.

for backup to perform a consent search is not encompassed within the ordinary tasks associated with a traffic stop as outlined in *Rodriguez*.  As noted above, typical traffic stop inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355; *see also Green*, 897 F.3d at 182 (assuming, but not concluding, that the *Rodriguez* moment occurred immediately after the officer had an initial conversation with the defendant and returned to his vehicle and made an unrelated phone call to his colleague).  Performing a consent search of a vehicle is unquestionably "aimed at detecting criminal activity more generally."  897 F.3d at 179.  Calling Trooper Weinstock to assist with a consent search was definitively unrelated to the initial mission of the traffic stop, which was to give Defendant a warning about violating the left lane law. Therefore, this analysis supports Defendant's assertion that the *Rodriguez* moment occurred when Trooper Urban contacted Trooper Weinstock for backup so he could ask Defendant for consent to search his vehicle.

After determining the *Rodriguez* moment, the Court turns to whether Trooper Urban had reasonable suspicion of criminal activity to justify extending the traffic stop.  The Court's review of Trooper Urban's testimony, the MVR, and other evidence shows that Trooper Urban has pointed to a sufficient number of facts that, when taken together, are enough to establish a reasonable, articulable suspicion of criminal activity to justify the extended traffic stop.

The reasonable suspicion standard "requires 'considerably less than proof of wrongdoing by a preponderance of the evidence,' but requires more than a 'hunch.'" *Garner*, 961, F.3d at 271 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). In applying this standard, courts invoke several common themes:

> First, reasonable suspicion must always be evaluated under the totality of the circumstances. Accordingly, courts have consistently refused to adopt per se rules declaring a particular factor sufficient or insufficient to establish reasonable suspicion. Second, when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Third, and consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each. In *Terry* itself, the Court found there was reasonable suspicion to justify the temporary seizures even though each factor relied on by the officer, viewed in isolation, might have seemed perfectly innocent.

*Green*, 897 F.3d at 183 (internal citations omitted).

The Government claims the following facts give rise to a reasonable suspicion of criminal activity: (1) Defendant's "extended breaking [sic] after the observation of police; (2) Defendant "had his paperwork prepared"; (3) Defendant's nervousness, as "reflected in his facial expression"; (4) the manner in which Defendant answered Trooper Urban's questions; (5) Defendant's actual responses to Trooper Urban's questions; (6) Trooper Urban knew the location of Defendant's hotel "to be a place where illegal drug sales and prostitution have taken place"; (7) Defendant's multiple convictions related to narcotics; (8) Defendant's home

address was listed on his driver's licenses as Elizabeth, New Jersey, which Trooper Urban

was familiar with as "a source location for controlled substances"; and (9) Defendant was

traveling on Interstate 80, which Trooper Urban considers "a common drug corridor." (Doc.

74 at 6–7). Defendant argues that "[w]hen viewed in its totality, the indicators cited by

trooper Urban fall short of reasonable suspicion and cannot be connected to objective

criteria." (Doc. 73 at 10).

Trooper Urban testified that his suspicion was first raised by Defendant's prolonged

braking pattern. (Hr'g Tr., at 6:19-22). Trooper Urban further elaborated on why he found

this driving behavior suspicious:

> The normal every day driving public, as they see a trooper, they'll brake, as
> they approach me. They'll drive past, you know, they'll look in the rear view
> mirror, they'll see the trooper didn't pull out after them, they'll resume their
> normal driving behavior. If they stayed on prior to coming at me, they'll speed
> up, if they made that lane change, maybe, they'll go back to the left lane. This
> was opposite. This was a prolonged brake after he had already passed.

(*Id*. at 6:23-25, 7:1-5).

Trooper Urban testified that his suspicion of Defendant's prolonged braking was

specifically informed by his prior training in driving behavior patterns, explaining:

> We had a two-day training in Ohio that was put on by Ohio State Police.
> Those two days was all training on driver behavior. They broke it down into
> three phases.
>
> Phase 1 is, as the car is approaching - - this is if you're sitting
> perpendicular on the highway.
>
> Phase 1 is as the car is approaching.

Phase 2 is pillar to pillar.

And Phase 3 is after they pass you.

They break that down into your normal driving behavior and what to look for that's different that may lead you to believe someone is engaged in criminal activity. So normal driving behavior, you know, all of us, as we drive down the highway, if we see a cop, first thing we do is hit our brakes, that's normal. We may change lanes if we're in the passing lane, that's normal.

. . .

Now, Phase 3 is when cars - - when they're driving away from you. Normal driving public, again, they hit their brakes, make that lane change. They'll look in their rear view mirror, Okay, the cop didn't pull out, I'm going back to how I was driving before. I'm going to speed up and go back in that left lane if I was in the right lane.

The criminal element may tuck in behind a tractor-trailer. If they already did, they're going to stay behind that tractor-trailer, they're going to continue slowing down, they may drift even further away onto the shoulder of the road.

So when Mr. Washington hit his brakes, after he was already past me, that is not normal. Normal would be somebody speeding up. He's slamming his brakes on to slow down.

(Hr'g Tr., at 28:15-25, 24:1-4, 18-25, 30:1-7).

Trooper Urban further testified that after introducing himself and asking for

Defendant's license, registration and insurance, he observed that Defendant "had his

license already in hand." (*Id*. at 9:4-6). Trooper Urban explained why this is an indicator of

criminal activity, stating that "I would think that, by the driver having that ready, they want to

speed the traffic stop up, show that they're overly compliant, to get me out of there as soon

as possible, so not to prolong the stop, but to shorten it." (*Id*. at 9:22-25). Trooper Urban

24

also stated that "[f]rom my experience in conducting interdiction on the highways, for me,

personally, that is an indicator.  That may not seem like not [sic] much to anybody, but that

indicator has resulted in numerous seizures, probably, within a year even prior to this."  (*Id*.

at 9:11-15).

Regarding Defendant's nervous behavior and responses to questions, Trooper

Urban testified that during their initial conversation he observed that Defendant was "slightly

tilted against his driver's door, his eyebrows were raised, his eyes were very wide and his

mouth was open."  (*Id*. at 9:6-8).  Trooper Urban also stated that Defendant "never made

eye contact, his answers were - - he paused before answering, looking up in the air."  (*Id*. at

10:11-12).

Trooper Urban also testified that he found the conversation itself notable.  (*Id*. at

10:6-9).  When Trooper Urban asked Defendant where he was heading, "he mentioned, the

hotel, a very vague answer."  (*Id*. at 10:9-10).  Trooper Urban stated that Defendant's story

caught his attention, particularly "that, he would be staying in a hotel in Wilkes-Barre but yet

working in Scranton."  (*Id*. at 10:6-16).  Trooper Urban also stated that he found the long

pauses in the story evasive, "especially, when he was talking about Scranton, explaining

work."  (*Id*. 13:25, 14:1).  Trooper Urban continued:

> That, in itself, wasn't deceptive, but the fact you're going to stay in Wilkes-Barre and work in Scranton, travel 30, 35 minutes to work, I don't know what company - - it would be more beneficial for the company to have you stay close to where you work rather than have you travel, and there's many hotels around Scranton, if that's where the job was.  That was my thoughts at the time.

25

(*Id*. at 14:1-8).

Defendant argues that the Court "should disregard the trooper's testimony about 'pauses' between answers as it conflicts with the video." (Doc. 73 at 26). However, the Court's review of the audio portion of the MVR reveals a pause in Defendant's answer when asked where his hotel was located, as well as a six second pause when he was trying to remember the name of the city where he was working. (MVR, at 00:02:39, 00:03:08).

Trooper Urban also stated that he found the location of Defendant's hotel suspicious based on his "[l]aw enforcement experience, as well as just being an informed citizen reading the news, that that hotel and several in that area are known for sales of narcotics and prostitution." (Hr'g Tr., at 11:23-25, 12:1).

In total, Trooper Urban testified to Defendant's extended braking after passing his patrol car, having his license in hand when Trooper Urban approached his vehicle, his nervous behavior exhibited through his facial expression, his vague and evasive responses to basic inquires, a trip to a location Trooper Urban knew was connected to drug activity, Defendant's prior narcotics-related felony convictions, his license hometown of Elizabeth, New Jersey, which he knew to be a drug source city, and the fact that he was traveling on Interstate 80, a highway Trooper Urban knew as a drug corridor. [5] Trooper Urban stated

---

[5] In addition to the facts observed by Trooper Urban discussed in the text, Trooper Urban's General Offense Report also noted that he detected "the strong odor of air freshener" during his initial conversation with Defendant, though he did not testify as to this fact during the suppression hearing. (Gov't. Ex. 2, Trooper Urban Report, at 1). This further adds to his basis for reasonable suspicion of criminal activity, as the scent of air freshener has been considered as part of the basis for reasonable suspicion by courts within this Circuit. *See Garner*, 961 F.3d 264 at 272 (holding the officer possessed reasonable suspicion to

that based on his experience in law enforcement, each of these observations was an

indicator of criminal activity.  While it is true that some of these facts might seem innocent in

isolation, under the totality of the circumstances approach, "reasonable suspicion cannot be

defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious

factor is viewed in isolation and plausible, innocent explanations are offered for each."

*Green*, 897 F.3d at 183 (citing *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018)).[6]

Other courts in this Circuit have found reasonable suspicion existed under

circumstances similar to those presented here.  For example, in *United States v. Thompson*,

773 F.3d 752, 759–60 (3d Cir. 2014), the Third Circuit found an officer possessed

reasonable suspicion to extend the traffic stop where the driver's behavior and physical

characteristics were indicative of suspicious behavior, he was visibly nervous, and "his

answers to questions came out hesitatingly."  Further, in *United States v. Terry*, No. 3:18-cr-

24, 2019 WL 2176330, at *17 (W.D. Pa. May 20, 2019), the District Court found that the

trooper had reasonable suspicion where the officer observed, in part, that the driver

exhibited nervousness when handing over his license, he gave confusing information about

---

extend the traffic stop where, in part, the officer "smelled a strong odor of air freshener and saw air
fresheners clipped on every vent"); *see United States v. Owens*, No. 1:09-cr-0078, 2010 WL 126170, at *6
(M.D. Pa. Jan. 8, 2010) (considering "the scent of excessive air freshener" as part of the totality of the
circumstances analysis leading to a finding that the officer possessed reasonable suspicion of drug activity
to support extending the traffic stop).

[6] For example, in *United States v. Mathurin*, 561 F.3d 170, 178 (3d Cir. 2009), the Third Circuit
acknowledged that while a criminal record alone is not enough to justify reasonable suspicion, when it is
considered along with other evidence linking the defendant to criminal activity, it is a valid factor to consider
when assessing reasonable suspicion under the totality of the circumstances standard.

the vehicle's registered owner, he was coming from Philadelphia, a known source city for narcotics, the travel itinerary was implausible, and the driver had an arrest record. More recently, in *United States v. Robertson*, No. 18-264, 2020 WL 3574368, at *9 (W.D. Pa. June 29, 2020), the District Court's basis for finding reasonable suspicion included the officer's observation that the vehicle "abruptly applied its brakes after observing [the officer's] marked police vehicle."

Thus, when these facts observed by Trooper Urban are considered in totality, taking into account his nine and a half years as a State Trooper, which includes particular training in highway interdiction, the Court finds that Trooper Urban possessed reasonable, articulable suspicion of criminal activity to justify extending the traffic stop. Therefore, Defendant's motion should be denied on this basis.[7]

---

[7]     As set out in the text, the Court adopts Defendant's identified *Rodriguez* moment. However, the Court has independently reviewed the earliest possible Rodriguez moment in light of post-*Rodriguez* Third Circuit decisions. Most notably, *Garner* concluded that the *Rodriguez* moment occurred when the trooper asked questions about the defendant's "employment, family, criminal history, and other conduct unrelated to the traffic stop," 961 F.3d at 271, based on the assessment that "the questioning was not tied to the traffic stop's mission—the speeding violation—because it was 'aimed at detecting criminal activity more generally'" *id.* (quoting *Green*, 897 F.3d at 179).

Here, during his initial questioning, Trooper Urban posed questions about Defendant's employment. As set out in the text, *see supra* pp. 2–3, Trooper Urban first explained the reason for the stop and asked for Defendant's license, registration, and insurance information. He then asked "Where are you off to today?" which, as a question related to travel plans, was within the scope of the travel stop. *Garner*, 961 F.3d at 271 (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410). After Defendant responded that he was going to his hotel room, Trooper Urban's question about where that was located was again a question related to travel plans. *See supra* pp. 3–4. After Defendant hesitatingly responded that the hotel room was in Wilkes-Barre and identified the hotel as the Days Inn, Trooper Urban turned to questioning Defendant about why he was staying there and asked several related follow-up questions when Defendant told him he was staying there for work. *Id.*

## 2. Dissipation of Reasonable Suspicion

Defendant next argues that "even if reasonable suspicion initially existed" to justify

extending the traffic stop, "it would have dissipated prior to the arrival of the canine unit."

(Doc. 53 at 18). The Government argues that "[t]he precedents concerning dissipation are

readily distinguishable from these facts," as "[i]n those cases, the initial reasonable

suspicion is undermined by an established fact or immutable characteristic rather than an

individual's subjective ability to calm down or think of additional details." (Doc. 74 at 9).

The Third Circuit recently emphasized that an officer's reasonable suspicion to

detain a suspect can dissipate over time, making the prolonged detention unreasonable:

> As the Supreme Court has explained: An investigative detention must be

---

The questioning in *Garner* is distinguishable from that which took place here because Trooper Urban's questioning did not include inquiries about family and criminal history. *See Garner*, 961 F.3d at 268, 271. Further, as set out above, before being asked employment-related questions, Defendant introduced the subject of his work in the context of explaining his travel plans which began with the question "Where are you off to today?".

While these distinctions with *Garner* and the general circumstances of this case make it unlikely that the questioning related to employment would give rise to a *Rodriguez* moment, if the Court were arguendo to assume otherwise, the Court would conclude that no Fourth Amendment violation occurred because reasonable suspicion existed before the employment questions arose. Before the questioning possibly veered off-mission when Trooper Urban asked Defendant why he was staying at the Days Inn, several factors objectively support his suspicion. Trooper Urban first noticed Defendant's atypical reaction to spotting his vehicle in the cross-over. Trooper Urban smelled air freshener when he got to Defendant's car. He observed nervous behavior initially and in the course of questioning. Defendant had his license and other documents in hand before they were requested. Defendant hesitated about where he was headed. Trooper Urban had knowledge that the hotel in which Defendant was staying was known for drug and prostitution activity. As fully explained in the text, the foregoing observations and facts are validly considered when analyzing the totality of the circumstances. *See supra* pp. 26–28 and n. 5. In their totality, they are sufficient to show that Trooper Urban's suspicion of illegal activity was objectively reasonable before he began asking questions about Defendant's employment. Therefore, even if the earliest possible *Rodriquez* moment were determined to be when Trooper Urban began to ask Defendant employment-related questions, he could extend the traffic stop without violating Defendant's Fourth Amendment rights.

temporary and last no longer than is reasonably necessary to effectuate the purpose of the stop.  Moreover, it is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope *and duration* to satisfy the conditions of an investigative seizure.  Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment.  An investigative stop must therefore cease once reasonable suspicion dissipates.

*United States v. Bey*, 911 F.3d 139, 147 (3d Cir. 2018) (internal quotations and citations omitted).

In *Bey*, two officers were pursuing an armed suspect after receiving a full description and viewing a photograph of the suspect.  *Id*. at 142.  Less than one minute after viewing the photograph, the officers discovered a man wearing similar clothes as the suspect and ordered him to stop, at which point they conducted a frisk and uncovered a weapon.  *Id*. The Court found that the two officers' suspicion was no longer reasonable once the suspect turned around and they were able to see the clear differences in appearance and age between the two men.  *Id*. at 147.

*Davila v. Northern Regional Joint Police Board*, 370 F. Supp.3d 498 (W.D. Pa. 2019), considered the situation where an officer conducted a valid traffic stop for a headlight violation and had doubts about the driver's identity.  The officer received confirmation of the driver's identity twenty-nine minutes into the stop.  *Id*. at 508–09.  Quoting *Bey*'s determination that "[a]n investigative stop must . . . cease once reasonable suspicion dissipates," 370 F. Supp.3d 498, 520 (quoting *Bey*, 911 F.3d at 147), *Davila* found that "any doubts as to the driver's identity were dispelled once [the county dispatch officer] confirmed

that her driver's license was valid." 370 F. Supp.3d at 520. Reasonable suspicion having

dissipated upon learning this information, *Davila* further concluded that the driver's "seizure

for the investigation of the headlight violation should have gone on no longer." *Id*.

Here, relying on *Bey*, Defendant claims that reasonable suspicion dissipated through

the conversations that took place while Trooper Urban, Trooper Weinstock and Defendant

were sitting in the patrol vehicle waiting for the Canine Unit to arrive. (Doc. 73 at 20–21).

Defendant asserts that his ability to provide clear responses regarding the details of his

employment, why he was driving on I-80 that night, and the street name of his hotel, as well

as the fact that "he [did] not appear nervous" during this discussion shows that Trooper

Urban's reasonable suspicion dissipated. *Id*.

Defendant's argument that reasonable suspicion dissipated in this case is unavailing

and his reliance on *Bey* is misplaced. In both *Bey* and *Davila*, the officers learned objective

facts which negated their earlier reasonable suspicion. In *Bey*, the officers had verifiable

proof that the man they had stopped was not the armed robbery suspect sought. *Bey*, 911

F.3d at 142. In *Davila*, the officer received information from an independent reliable source

that the driver's identification was accurate. *Davila*, 370 F. Supp.3d at 520. Trooper Urban

did not learn of any objective facts during the casual conversation with Defendant in his

patrol car that provided confirmation that the details given by Defendant regarding his travel

and employment during their initial conversation were accurate. Defendant provided

additional subjective information while in the patrol car, but no facts were objectively verified

31

as they had been in *Bey* and *Davila*.

The Government asserts that, "[a] suspect's ability to calm down and provide more compelling detail over the course of an approximate half hour should not prevent an officer from continuing to investigate a case where the suspect initially behaves suspiciously." (Doc. 74 at 9). The Court agrees with this assessment. A suspect's ability to enhance his previous answers and present a more calm demeanor does not dispel reasonable suspicion in the same way as an objective verification such as clear mistaken identity or a factual record check does.

Further, in *Bey* and *Davila* the officers had a singular basis for their initial suspicion. *Bey*, 911 F.3d at 142–43 (finding the only basis for the officer's suspicion of the suspect was that he was wearing similar clothing as the suspect in the photograph); *Davila*, 370 F. Supp.3d at 517 (noting that the officer admitted that the driver had done nothing to cause him to believe that she might not have been lawfully present in the United States). Here, Trooper Urban's suspicion that criminal activity was occurring or had occurred was based on the numerous factors discussed in the previous section of this Memorandum Opinion.

For the reasons discussed, the Court finds that the conversation that occurred in the patrol car did not result in the dissipation of Trooper Urban's reasonable suspicion of criminal activity. Therefore, the Court will deny Defendant's motion insofar as it seeks suppression based on the dissipation of reasonable suspicion.

## C. Duration of Traffic Stop

In the section of his post-hearing brief titled "Lack of diligence results in de facto arrest," Defendant claims that "Trooper Urban acted unreasonably and lacked diligence while awaiting the K-9 unit." (Doc. 73 at 22 (citing *United States v. Sharpe*, 470 U.S. 675 (1985); *United States v. Place*, 462 U.S. 696 (1983)). The Government contends that length of the delay in this case was reasonable. (Doc. 58 at 16).

The Court of Appeals for the Third Circuit has observed that "[i]n certain circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause." *United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) (citing *Sharpe*, 470 U.S. at 685). In considering the durational aspect of a stop, *Sharpe* addressed the lower Court's determination that the twenty-minute detention of an individual transformed a *Terry* stop into a *de facto* arrest. 470 U.S. at 683. Assessing the effect of duration on the Fourth Amendment's reasonableness analysis, the Court noted its previous determination in *Florida v. Royer*, 460 U.S. 491 (1983), "that 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" 470 U.S. at 684 (quoting *Royer*, 460 U.S. at 500). The Court also reviewed its continuing adherence to that approach in *Place* where it clarified that "'[i]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.'" 470 U.S. at 685 (quoting *Place*, 462 U.S. at 709).

*Sharpe* acknowledged that, in some instances, the Court's earlier cases may have

created "difficult line-drawing problems in distinguishing an investigative stop from a *de*

*facto* arrest."  470 U.S. at 685.  The Court then explained that

> if an investigative stop continues indefinitely, at some point it can no longer be
> justified as an investigative stop. But our cases impose no rigid time limitation
> on *Terry* stops. While it is clear that "the brevity of the invasion of the
> individual's Fourth Amendment interests is an important factor in determining
> whether the seizure is so minimally intrusive as to be justifiable on reasonable
> suspicion," *United States v. Place, supra,* 462 U.S., at 709, 103 S.Ct., at 2645,
> we have emphasized the need to consider the law enforcement purposes to be
> served by the stop as well as the time reasonably needed to effectuate those
> purposes. *United States v. Hensley,* 469 U.S., at 228–229, 234–235, 105 S.Ct.,
> at 680–681, 683–684; *Place, supra,* 462 U.S., at 703–704, 709, 103 S.Ct., at
> 2642–2643, 2645–2646; *Michigan v. Summers,* 452 U.S. 692, 700, and n. 12,
> 101 S.Ct. 2587, 2593 and n. 12, 69 L.Ed.2d 340 (1981) (quoting 3 W. LaFave,
> Search and Seizure § 9.2, pp. 36–37 (1978)). Much as a "bright line" rule would
> be desirable, in evaluating whether an investigative detention is unreasonable,
> common sense and ordinary human experience must govern over rigid criteria.

*Sharpe*, 470 U.S. at 685.  Having rejected the establishment of a bright line rule, the Court

concluded that

> [i]n assessing whether a detention is too long in duration to be justified as an
> investigative stop, we consider it appropriate to examine whether the police
> diligently pursued a means of investigation that was likely to confirm or dispel
> their suspicions quickly, during which time it was necessary to detain the
> defendant.

*Sharpe*, 470 U.S. at 686.

In this analysis, "the court should not indulge in unrealistic second-guessing. . . . The

question is not simply whether some other alternative was available, but whether the police

acted unreasonably in failing to recognize or to pursue it." *Id.* at 686-87.

34

Here, after pulling Defendant over for a traffic violation, Trooper Urban completed tasks ordinarily associated with a traffic stop, which included informing Defendant why he pulled him over and running a check of his license. (MVR, at 00:01:44-00:06:09). After learning of Defendant's criminal history, Trooper Urban promptly contacted Trooper Weinstock for backup, which occurred approximately six minutes into the stop. *Id*. As the Court determined above, Trooper Urban had reasonable suspicion to extend the traffic stop at that point.

Trooper Weinstock arrived approximately nine minutes into the stop. (MVR, at 00:08:45). Trooper Urban then asked Defendant to step out of the vehicle, where he performed a pat down search and asked for Defendant's consent to search the vehicle. (*Id*. at 00:13:08). After Defendant refused to consent to the search, Trooper Urban promptly requested the Canine Unit. (*Id*. at 00:14:10). At sixteen minutes into the stop, Trooper Urban stated that the Canine Unit was on its way. (*Id*. at 00:16:01). Corporal Doblovasky and Canine Micho arrived approximately thirty minutes later, at forty-five minutes into the stop. (*Id*. at 00:44:58). The dog sniff lasted approximately two minutes. (*Id*. at 00:47:47-49:25). After Canine Micho alerted to the presence of narcotics, Trooper Urban and Corporal Doblovasky then conducted an interior search Defendant's vehicle, at which point they uncovered a gun. (*Id*. at 00:50:54-00:52:45). Overall, from the time Defendant was pulled over to the discovery of the gun, approximately fifty minutes elapsed.

Corporal Doblovasky testified as to the approximately thirty-minute delay between

when Trooper Urban called for a canine and when Corporal Doblovasky arrived at the scene. He explained that, because he was off-duty when he received Trooper Urban's call, he had to travel from his residence to the scene and "we get there as fast as we can." (Hr'g Tr., at 93:24-25). He also testified more generally about geographic and personnel factors in response time: the Canine Unit covers multiple counties and numerous jurisdictions within those counties; it can take an hour or more to get to certain parts of his coverage area; and a Canine Unit from another area would take longer to get to the scene. (*Id*. at 93:13-94:9).

Although Defendant alleges that Trooper Urban "lacked diligence" (Doc. 73 at 22), he does not identify how Trooper Urban failed to act diligently. (*See id.* at 22-23). While he suggests that Trooper Urban "could have done more to dispel suspicion in this case (*id.* at 23), he provides no support for this conclusory statement. Defendant cites *United States v. Fraguela-Casanova*, 858 F. Supp. 2d 432, 443 (M.D. Pa. 2012), in support of his *de facto* arrest claim, but he notes only that the court found a lack of diligence and a *de facto* arrest resulted from a 74-minute delay. (Doc. 73 at 22-23). Because each case is fact specific, *see Sharpe*, 470 U.S. at 683-87, Defendant's mere citation to a case with distinguishable facts is unavailing. Thus, Defendant has not shown how Trooper Urban failed to act diligently to confirm or dispel his suspicions in this particular traffic stop.

Defendant instead points to the flaws in the Pennsylvania State Police drug detection unit as a whole, asserting that "a motorist held on little suspicion could wait inside a locked

patrol car for up to an hour awaiting the arrival of a dog.  Supervisors in the state police

know this problem exists, and do not act."  (Doc. 73 at 23).  Defendant's unsupported

generic criticism of the system related to the Canine Unit does not show a lack of diligence

on the part of Trooper Urban.  Further, to associate a potential systemic problem with the

analysis of the facts of a specific case is akin to the type of prohibited "*post hoc* evaluation

of police conduct [which] can almost always imagine some alternative means by which the

objectives of the police might have been accomplished."  *Sharpe*, 470 U.S. at 687.

United States v. Leal, 235 F. App'x 937, 942 (3d Cir. 2007), is instructive in the

circumstances presented here.  In *Leal*, a police officer lawfully stopped the defendant's car

at approximately 1:30 p.m.  *Id.* at 938; *United States v. Leal,* 385 F.Supp.2d 540, 542 (W.D.

Pa. 2005).  The officer suspected the vehicle contained narcotics and requested a canine

unit to respond to the scene at approximately 1:45 p.m.  385 F. Supp. 2d at 544.  The

canine unit arrived at the scene approximately forty-five minutes to an hour later resulting in

detention of one hour and twenty minutes.  235 F. App'x at 940; 385 F. Supp. 2d at 545.

The delay was attributed in part to road construction on route.  Concluding that "Leal's

detention may have bumped up against the outer limit of a *Terry* stop, but it did not cross

it," the Third Circuit panel affirmed the district court's denial of the defendant's motion to

suppress.  235 F. App'x at 942.  In doing so, the panel reasoned that the officer's efforts to

"expeditiously resolve his suspicions were frustrated by circumstances beyond his control,"

and the "quantity and quality of the factors that gave rise to [the officer's] suspicion"  in

conjunction with his diligent efforts to investigate demonstrated the reasonableness of the *Terry* stop. *Id.*

Similar to *Leal*, here the timeline set out above indicates that Trooper Urban requested the Canine Unit to respond less than fifteen minutes into the stop. The Canine Unit responded to the scene in less time than in took in *Leal*, but, as in *Leal*, the delay was due to circumstances beyond Officer Urban's control. As the *Leal* Court determined, this Court has concluded that multiple reasonable suspicion factors support the extension of the traffic stop. Although the Third Circuit panel found that Leal's detention of one hour and thirty minutes "bumped up against the outer limits of a *Terry* stop," 235 F. App'x at 942, here approximately fifty minutes elapsed from the initial stop to the discovery of the gun. Finally, as in *Leal*, the Court finds no basis upon which to conclude that Trooper Urban did not act diligently.

In sum, based on the steps taken by Trooper Urban throughout the traffic stop and factors related to the Pennsylvania State Police Canine Unit coverage and deployment system, the Court finds that Trooper Urban "diligently pursued a means of investigation that was likely to confirm or dispel" his suspicion of criminal activity. *Sharpe*, 470 U.S. at 686. Therefore, the Court will deny Defendant's Motion to Suppress insofar as it is based on a claimed *de facto* arrest.

### D. Canine Unit Search

Finally, Defendant argues that Canine Micho "lacks reliability or did not alert." (Doc.

73 at 23).  The Government argues that "Canine Micho's alert and indication to the

presence of controlled substances in the truck [sic] fully justified the warrantless search of

the vehicle."  (Doc. 74 at 10).  The Government further asserts that "the record shows that

Micho was a reliable drug detection canine and his alert and indication behavior was readily

identified to Corporal Doblovasky."  (Doc. 74 at 13).

Warrantless searches are generally presumed to be unreasonable, subject to "a few

specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S.

347, 357 (1967).  One of such exceptions allows an officer to search the interior a vehicle

without a warrant provided he has developed "probable cause to believe that the vehicle

contains evidence of a crime."  *United States v. Donahue*, 764 F.3d 293, 299–300 (3d Cir.

2014).

It is well established that "a dog's positive alert while sniffing the exterior of the car

provides an officer with the probable cause necessary to search the car without a warrant."

*United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010); *see also United States v.*

*Johnson*, 742 F. App'x 616, 622 (3d Cir. 2018).  To determine whether a drug detection

canine is sufficiently reliable, the Supreme Court has provided the following guidance:

> [E]vidence of a dog's satisfactory performance in a certification or training
> program can itself provide sufficient reason to trust his alert.  If a bona fide
> organization has certified a dog after testing his reliability in a controlled setting,
> a court can presume (subject to any conflicting evidence offered) that the dog's
> alert provides probable cause to search. The same is true, even in the absence
> of formal certification, if the dog has recently and successfully completed a
> training program that evaluated his proficiency in locating drugs. After all, law
> enforcement units have their own strong incentive to use effective training and

certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Florida v. Harris*, 568 U.S. 237, 246–47 (2013).

"A defendant … must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witness." *Id*. at 247. If the defendant challenges the dog's reliability or the reliability of a particular alert, "then the court should weigh the competing evidence." *Id*. at 248. When weighing the evidence, "[t]he question – similar to every inquiry into probable cause – is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id*.

Here, Corporal Doblovasky testified that Canine Micho was certified by the Pennsylvania State Police in the detection of Marijuana, hashish, cocaine hydrochloride, cocaine base, heroin hydrochloride, D-methamphetamine hydrochloride and all derivatives of the foregoing. (Hr'g Tr., at 72:18-23). Corporal Doblovasky testified that Canine Micho underwent three months of initial training in 2012, and that he was certified every year up until his death in 2020. (*Id*. at 73:21-25, 74:1). The last time Canine Micho successfully completed certification prior to the December 3, 2019 traffic stop was on October 29, 2019, when he participated in the Pennsylvania State Police, Canine Section Drug Detector Dog Certificataion. (Hr'g Tr., at 72:12-14; Gov't Ex. 3, Micho Training Documents, at 1).

40

Corporal Doblovasky also testified about the details of the training program generally and the September 11, 2019, pre-arrest training specifically.  (Hr'g Tr., at 73:6-20, 74:21-25, 75:1-21).

As set out above, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  *Harris*, 568 U.S. at 247–48).  Thus, as Canine Micho was trained and certified as a drug detection dog by the Pennsylvania State Police, which involved testing his reliability for detecting various drugs in a controlled setting, under *Harris*, the Court can presume that Canine Micho's alert was sufficiently reliable to provide probable cause, subject to any conflicting evidence offered by Defendant.  *See United States v. Xiao Wu Zhou (1)*, No. 4:17-CR-394, 2019 WL 3564579, at *5 (M.D. Pa. Aug. 6, 2019) (citing *Harris*, 568 U.S. at 246–47) (finding a drug detection dog's training schedule and record support a presumption that his alert and indication behaviors are reliable).

Defendant bases his challenge of Canine Micho's reliability on the testimony of Jerry Potter, who was offered as an expert in detection dog behavior, training and utilization.  (Hr'g Tr., at 120:24-25).  Defendant asserts that "when it came to [Mr. Potter's] final opinion here and relying on the records he reviewed, he strongly questioned whether K-9 Micho had indicated and whether any dog could have indicated to what the police suspected as marijuana residue."  (Doc. 73 at 24).

To determine whether Defendant's asserted conflict undermines the presumption of reliability discussed above, the Court must weigh the evidence. *Harris*, 568 U.S. at 248. Mr. Potter primarily testified as to canine training techniques generally, as well as what he believed were flaws in the Pennsylvania State Police's particular training methods. (*See, e.g.*, Hr'g Tr., at 129-139). However, as Defendant noted in his post-hearing brief, Mr. Potter also acknowledged that "there are various schools of thought" regarding training canines, and that he would need more information to assess the reliability of the Pennsylvania State Police dogs.[8] (*Id.* at 122:5-11). Mr. Potter's general criticism of canine training methods utilized by the Pennsylvania State Police cannot be seen as undermining the presumption of Canine Micho's reliability under *Harris*.

A close examination of Mr. Potter's testimony shows that his assessment of Canine Micho's specific reliability in this case is equivocal and, for the most part, relates to an

---

[8] Acknowledging that Mr. Potter was "speaking in kind of hypothetical terms about how this could affect the dogs," defense counsel asked Mr. Potter whether he needed more to determine "what the reliability of the dogs might be." (Hr'g Tr., at 130:14-17). In response, Mr. Potter stated that "I would have to see all of the training utilization records to be able to make that determination." (*Id.* at 130:18-19). Further, when asked if he "need[ed] something more," Mr. Potter stated "[i]n order for me to make an informed or an intelligent opinion, yes, I based my current opinions on the information that I was provided." (*Id.* at 130:24-25, 131:1).

Defense counsel also suggested through his questioning that the Court might expect to receive a subsequent filing regarding Mr. Potter's opinion as to Canine Micho's reliability, stating: "If I were to give you - - with the Court's permission - - if we were able to get these utilization records and you were able to arrive at an opinion, could you put that in writing or, otherwise, somehow, get an opinion, after reviewing those records?" (*Id.* at 131:2-6). Mr. Potter responded that "[i]f reviewing those records altered my opinion, absolutely." (*Id.* at 131:7). The Court, however, received no further submissions from Defendant on the issue of Canine Micho's reliability.

assessment of how Canine Micho was trained.  (*See, e.g*, Hr'g Tr., at 133:20-138:7).  His

testimony also reveals that neither the training materials he reviewed nor video footage of

the dog sniff search allowed him to determine with certainty that Canine Micho did not

properly indicate the presence of drugs when considered in the context of the specific

training Canine Micho had received.  (Hr'g Tr., at 134:10-135:24).  In addition to the fact that

Canine Micho did not behave as would a dog trained in a different reward system method,

Mr. Potter's "biggest concern" was that Canine Micho walked away from the vehicle without

a toy reward after exhibiting his drug indication behavior.  (*See* Hr'g Tr., at 151:6-14).

 In contrast to this conclusion, Corporal Doblovasky testified that, when performing in

the field, Canine Micho was rewarded with verbal and physical praise (rather than a toy)

according the Pennsylvania's standards.  (*Id*. at 104:19-22, 105:16-18).  He further testified

that, while on video in this case, he gave Canine Micho a pat on the head and told him

"good job" after he indicated to the presence of drugs.  (*Id.* at 105:16-18).

 Based on a review of the testimony of Corporal Doblovasky, Defendant's expert

witness Jerry Potter and other relevant evidence, the Court concludes that Canine Micho

was sufficiently reliable for his alert to give the officers probable cause to search

Defendant's vehicle.  It is undisputed that Canine Micho was trained and repeatedly certified

by the Pennsylvania State Police as a drug detection canine.  Corporal Doblovasky testified

that Canine Micho exhibited his trained alert and indication behaviors upon detecting the

presence of drugs in Defendant's vehicle.  (Hr'g Tr., at 89:23-25, 90:11-19).  Corporal

Doblovasky further testified that Canine Micho was rewarded with praise according to Pennsylvania's standards. (*Id*. at 104:19-22, 105:16-18). Further, the Government is correct to point out that for the Court "[t]o find that Mr. Potter's testimony alone is sufficient to undermine the entire canine program run by the Pennsylvania State Police would be extreme." (Doc. 74 at 13). Because the evidence of record, "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime," the Court concludes that Canine Micho's alert behavior gave Trooper Urban and Corporal Doblovasky probable cause to search Defendant's vehicle. *Harris*, 568 U.S. at 248. Therefore, the Court will deny Defendant's Motion to Suppress based on problems with the canine search.

## III. CONCLUSION

The Court having addressed all arguments identified by Defendant in favor of suppression, and the Court having found all to be without merit, Defendant's Motion to Suppress Stop and Search of Vehicle (Doc. 52) will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge